WILSON *v.* DETROIT UNITED RAILWAY.

1. CARRIERS—BLIND PASSENGERS—NEGLIGENCE.

Whether a street railway company is bound to accept as a passenger a blind man, unaccompanied, depends on his capacity to travel alone and to care for himself.

2. SAME—TRANSFER—DUTY AT PLACE OF.

The relation of carrier and passenger continues while the passenger is transferring from one car to another as a part of one continuous trip after having secured a transfer ticket.

3. SAME—PRINCIPAL AND AGENT — HIGHWAYS AND STREETS — ASSURANCE TO PASSENGERS—CONDUCTORS.

An assurance to a blind passenger, given by defendant's conductor, that the way was clear to cross defendant's tracks at a point of transfer, was not negligence, although the passenger was struck by a car in passing over the track, where there was in fact no obstruction and plaintiff knew that cars and vehicles were constantly passing in either direction.

4. SAME—CONTRIBUTORY NEGLIGENCE.

Plaintiff, who was blind, secured a transfer from defendant's car to another line at the intersection of three streets, and on being assured by the conductor that the way was clear, started to cross the tracks of defendant at the intersection and was struck by defendant's car. Plaintiff testified that no gong was sounded; that he relied on the assurance of the

conductor; that he was intent on other things; that he paid no attention to the noise of a car crossing the intersection, thinking it was on the other street; that he knew cars might be passing in either direction at that point; that he was listening for automobiles or passing vehicles. *Held,* that he was guilty of contributory negligence.

Error to Wayne; Murphy, J. Submitted June 12, 1911. (Docket No. 40.) Decided October 2, 1911.

Case by Edward Wilson against the Detroit United Railway for personal injuries. A judgment for defendant on a verdict directed by the court is reviewed by plaintiff on writ of error. Affirmed.

*James H. Pound,* for appellant.

*Brennan, Donnelly & Van De Mark* (*W. G. Fitzpatrick,* of counsel), for appellee.

Stone, J. This is an action on the case for damages which the plaintiff sustained by being injured, on September 7, 1907, at the crossing of the Trumbull avenue street car line with the Grand River avenue line of defendant's road, in the city of Detroit.

It is the claim of the plaintiff that he was, at the time of the injury, and had been for a number of years, totally blind. At the time of the trial, he testified that he was 47 years of age; that he was a piano tuner, and had carried on that business for 18 years in the city of Detroit. On the evening of the day in question, and about 5:45 p. m., the plaintiff testified that he took the Trumbull avenue car at the corner of Mt. Elliott and Congress streets, in the city of Detroit, to go to the northwestern part of the city; that he paid his fare to the conductor; and that at the time of so doing he stated that he wanted a Grand River avenue transfer. We append here a plat of the location where the plaintiff was injured, which is found in defendant's brief, and the accuracy of which is not questioned.

A transfer in the usual form was furnished to the plaintiff; and after arriving at the place of transfer, and at the time of alighting from the Trumbull avenue car, the plaintiff asked the conductor if the way was clear for his

crossing the track. The conductor said, "Yes; everything is all right," and to go ahead. Plaintiff desired to take the Grand River avenue car going west. The place where he alighted was a paved street, much traveled and

frequented at that hour of the day.   It was  necessary for
him to go in a northerly direction some 50 or 60 feet across
Grand  River  avenue  toward  the  Grand  River  avenue
track, and as he was about to cross the track he was struck
by an east-bound car upon said last-named track.   He
sustained an injury, breaking  two bones of his left leg
above the ankle.   He testified that he  heard  no gong
sounded, and that he thought everything was clear.

The negligence complained of is that of the conductor
of the Trumbull avenue car in having stated to plaintiff
that everything was all right, and of the servant in charge
of the east-bound car upon the Grand River avenue track
in running his car upon the plaintiff and injuring him.
Plaintiff testified that he knew and was familiar with the
location; that he knew of the tracks in Myrtle street, and
knew of the double tracks on Trumbull avenue and Grand
River avenue; that he had before made transfers at this
point, going both east and west; that it had been raining;
that he carried his umbrella, which was not raised, in his
left hand, with his tool case, and had a cane in his right
hand; that the talk which he had with the conductor of
the Trumbull avenue car was as he was getting off the
platform of that car; that he walked in the usual gait
and manner; that he knew the cars went in both direc-
tions on Grand River avenue, and that they would be
moving in both directions at this time of day, and that
automobiles and other vehicles were passing and repass-
ing at this point, and that the only things he was listen-
ing for were automobiles and the west-bound car, which
he desired to take; that he walked on the pavement all
the way, and claimed that he had in his mind a fairly good
map of the place and location, by having frequently
walked there and knowing the points of the compass, and
how the streets run, and that he understood the plan of
the corner; that he knew where the Grand River avenue
car made its ordinary stop in going east before crossing
the Myrtle street line.   He testified that he did not ob-
serve the circle track appearing upon the plat, and that

he must have been north of it in crossing. He frequently stated in his testimony: "I relied on the assurance that the way was clear." It was a lowery, cloudy evening, and the lamps were lighted at the street crossing.

On his direct examination, the plaintiff testified that he had lived on the west side of the city all his life. After describing the taking of the car, about 5:45 p. m., going westward, he stated that he paid his fare to the conductor and asked him for a Grand River transfer; that as he arose from the car, from the second seat back, he inquired of the conductor if the way was clear for his crossing the tracks; that the conductor said, "Yes, everything was all right," and to go ahead; that the car in which he then was was stationary; that he left the car and proceeded to the Grand River tracks, to get in a position for the car going west; that he had his cane with him, and stepping in the triangle on the pavement he walked as carefully and hastily as he could with safety to cross; that as he stepped evidently over the tracks upon which the car would go toward the east he was struck by the east-bound car, resulting in the breaking of two bones in his left leg above the ankle; that the car came to a stop, and that he knew nothing of the approach of the car, hearing no gong rung; that he thought everything was clear for safe crossing; that after breaking the bones he immediately took hold of the iron holding the fender to the car, and sat down on the fender, instead of being thrown; that the motorman and conductor came down, and took him from the car to a grocery on the corner near by, and set him in a chair, from whence he was removed to the hospital; that for about 18 years he had been in the piano tuning business; that he worked from place to place in the city; that during all this time he had been going around doing his work by himself, always alone, and up to this time had got along without any injury; that during all this time he had made use of the cars as other people might.

On cross-examination he testified:

"*Q.* You have frequently ridden on that car line?

"*A.* Very frequently. It was a closed car that I was riding on that day, and I got off and got on the rear entrance.

"*Q.* When you had occasion to use that line and transfer, it was usually at Grand River?

"*A.* Very often at Grand River. I live on Fourteenth avenue, three streets from Grand River, and three streets from Myrtle. I am about midway; either Myrtle or Grand River cars would take me very closely to my destination—one almost as closely as the other.

"*Q.* You had frequently had occasion to go further north on Trumbull or Grand River on the cars?

"*A.* Yes, sir. I also at the time of the accident knew that there was a car line running out on Myrtle from Grand River at that point.

"*Q.* Just half a block below Trumbull. You knew that there was a double track on Trumbull avenue?

"*A.* Yes, sir.

"*Q.* In any case, you knew that the Myrtle track intersected the Trumbull track at that point?

"*A.* I am very familiar with it; yes, sir. I also knew that the Trumbull track proceeded further north on Trumbull beyond Grand River, and I had had occasion to ride on that line previous to the injury.

"*Q.* Had you ever had any occasion to transfer from the Trumbull line north of Grand River on to the Crosstown?

"*A.* Yes, sir; I have made that transfer in going in both directions, both east and west. * * *

"*Q.* The stop they made south of the Myrtle tracks was a compulsory stop, because of the fact that they were approaching the car tracks—you knew that?

"*A.* Yes, sir. * * *

"*Q.* Why, on this particular occasion, did you not transfer onto the Myrtle car going west?

"*A.* I was making for the barber shop. It was Saturday, at supper time, before I went to supper; I was aiming to get at the barber shop at Wabash and Grand River, continuing on Grand River; that would be a long block east of Fourteenth, south side. * * *

"*Q.* What was the weather at the time of the injury; it rained?

"*A.* Not so that I had to use my umbrella.

"*Q.* It was raining?

"*A.* Certainly it rained. It was not raining at the time I got out of the car; it possibly had just previous to that time; it had showered, I am pretty sure.

"*Q.* It was not raining at all when you stepped down from the car?

"*A.* I am sure it was not.

"*Q.* You had an umbrella with you?

"*A.* Yes, sir; I had my tool case and my umbrella with me. The umbrella did not take the place of my cane or walking stick; I had my cane, too; I carried my tool bag and umbrella in the left hand, and my cane in the right.

"*Q.* How far, if you know, was it from where you got off the car to the east-bound Grand River track?

"*A.* Well, I don't know as I could tell you just the distance; I have done that several times. I should judge it would be 40 or 50 or 60 feet, along in there; that is, to the east-bound Grand River track to the point where I got off the car.

"*Q.* Your car had come to a full stop?

"*A.* Yes, sir. * * *

"*Q.* And you immediately proceeded to the pavement?

"*A.* Yes, sir.

"*Q.* And then in a northerly direction toward the Grand River track?

"*A.* Yes, sir. * * *

"*Q.* Had anything interrupted your passage from the point where you got off the Trumbull avenue car to the place where you were struck?

"*A.* No, sir.

"*Q.* You were not impeded in any of your movements?

"*A.* Not at all.

"*Q.* And walked along at a usual gait?

"*A.* Yes, sir.

"*Q.* And in the usual manner?

"*A.* Yes, sir.

"*Q.* At the time the conductor said to you that the way was clear, you don't know what the actual condition of Grand River was?

"*A.* As I could take it in by hearing, it seemed very quiet, comparatively speaking.

"*Q.* You knew, of course—I think you said this morning—that cars would be apt to be going in both directions on Grand River avenue at that time?

"*A.* They do go in both directions.

"*Q.* You knew that at that time of the evening there would be apt to be a car moving east on Grand River at any moment?

"*A.* Certainly; I asked for the information.

"*Q.* You knew that in advance of your asking for information; you knew that fact?

"*A.* Yes, sir.

"*Q.* You knew that there would be apt to be cars moving west on Grand River at any moment at that time of the day?

"*A.* Yes, sir.    *    *    *

"*Q.* And from the time that you left the point, getting out of the car and started for Grand River avenue, did you hear the motion of any car?

"*A.* Well, if I did—

"*Q.* The question is, Did you hear the motion of any car?    *    *    *

"*A.* I don't recall hearing the movement of any car.

"*Q.* Will you say that you didn't hear the movement of any car after you had gotten off the Trumbull car, and while you were moving in the direction of Grand River avenue?

"*A.* I will say that I received no impression of it.

"*Q.* Will you say that you didn't hear them?

"*A.* Well, practically, yes, because my ear made no impression upon my brain; if I did, I didn't hear it.

"*Q.* You mean that you have no recollection of having heard it?

"*A.* Yes, sir.

"*Q.* No present recollection?

"*A.* I am safe in saying that I didn't hear it.    *    *    *

"*Q.* Was there anything in the situation there that night that would render it difficult or impossible for you to hear a car east bound on Grand River avenue intersection?

"*A.* There was nothing extraordinary about me that I remember now.

"*Q.* You know, do you not, that a street car crossing an intersection of another line, makes a pounding, jolting noise as it crosses the intersection?

"*A.* Yes, sir; it does.

"*Q.* You say that you have no impression of having heard any such pounding, jolting noise that night immediately prior to your injury?

"*A.* I took no notice of it.

"*Q.* Then you have no impression of having heard it?

"*A.* I have no impression of hearing it; I could have heard it, but I felt very safe in my position. I received no impression that I could recall.

"*Q.* You say you could have heard it—is that what you said?

"*A.* I possibly could have heard it, if I was worried over the matter.

"*Q.* You could have heard the street car approaching and making the crossing at Trumbull, if you had been listening for it?

"*A.* Not if I had been listening; but if I had worried over the matter I might have taken in the situation. I didn't hear it, because I was told to pass on, and that, of course, would give me no worry of any approaching car.

"*Q.* But you still think you didn't hear it, in point of fact?

"*A.* I tell you I cannot recall it.

"*Q.* It made no impression on you; therefore you still insist that you don't think you heard it?

"*A.* Not to receive any special impression. I was intent on the direction I was going. My mind was on doing what was to be done properly.

"*Q.* That is to say, your mind was engaged entirely with the idea that it was necessary for you to proceed in a general northerly direction across the Grand River avenue tracks to a point where?

"*A.* Where you would be safe.

"*Q.* Where you would board the west-bound Grand River avenue car?

"*A.* Yes, sir; that was what my mind was intent upon.

"*Q.* And for that reason you now say to us you don't know whether you heard this sound of the car crossing that intersection or not?

"*A.* No; I paid no attention to it; I didn't worry about it; I didn't think it was anything.

"*Q.* You don't wish to change your answer, that you paid no attention to it?

"*A.* No; I paid no attention to it; if I would have thought of it, I would have thought it was a Trumbull car going on. * * *

"*Q.* You testified this morning that you heard no gong; but, in view of the state of your mind at that particular time, even if a gong had been rung, you would not have heard it?

"*A.* Oh, yes; I was listening for automobiles and the west-bound.

"*Q.* Were you listening in a way so that you would hear a gong in a street car in a way that you would not hear the noise of a street car crossing the intersection?

"*A.* I was listening for the gong, yes, sir, very much differently from what I would the crossing of a street car, because it would naturally impress me as being the Trumbull avenue car going on, and that gave me no worry. But a gong I am always listening for.

"*Q.* Would there be any likelihood of a gong being rung at that time, even a gong on the Trumbull avenue car?

"*A.* Yes, sir; it would be likely.

"*Q.* So that if it happened to be a gong on the Trumbull avenue car that would give you no more concern or worry than the noise that the wheels made in making the intersection?

"*A.* I think if the car being near me rung a gong I would have realized it; I would have stood still.

"*Q.* Did you hear any warning at all from any quarter before you were struck?

"*A.* No; I received no warning from any quarter.

"*Q.* Immediately prior to the incident of the accident, was there anything in the situation there that would have rendered it difficult or impossible for you to have heard an ordinary warning?

"*A.* Nothing that I am conscious of.

"*Q.* The point where you got off the car, you understand, of course, was a public highway?

"*A.* A public highway; yes, sir.

"*Q.* When you were getting off the car, you asked the conductor if the way was clear?

"*A.* Yes, sir.

"*Q.* You had to proceed entirely in the public highway from the point of disembarkation to the point of transfer where you got on again?

"*A.* Yes, sir.

"*Q.* And you didn't hear, or at least you are not to any extent conscious of having heard, the sound of any car moving in any direction from the time you got off the Trumbull avenue car until the time you were struck?

"*A.* Not to be impressed. You can understand how I can concentrate myself, for the purpose of my being conscious, not to take in some minor matters.

"*Q.* I understand that perfectly, and for that reason, the state of mind considered, and your rapidity to concentrate your mind in that way, is why I ask you whether you have any present recollection of having heard the noise of any car moving in any direction from the time you got off the Trumbull car until the very instant you were hit ?

"*A.* I received no impression that I recall."

On redirect examination the witness testified that when he alighted from the rear platform he was standing on the pavement, and from where he alighted to the point where he was struck he was on the pavement; that he went along feeling with his cane; that he had a fairly good map in his mind of those places; that he always found out the points of the compass, north, south, east, and west, and how each street ran, and formed a plan in his mind; that he understood the plan of that corner very well; that upon these tracks there might be cars coming south on Trumbull, as well as going north, and going east on Grand River, as well as west, and this is also true of Myrtle, whose traffic was east and west.

At the close of the plaintiff's testimony, the defendant moved for a directed verdict in its favor, upon the ground:

(1) That there had been no evidence of negligent operation of either the Trumbull avenue or Grand River avenue cars.

(2) That the plaintiff, by the undisputed evidence, appeared to have been guilty of negligence, which either directly caused, or contributed to, the injuries which he received.

The trial court at that stage of the case struck out the testimony tending to show that the conductor assured the plaintiff that the roadway ahead of him was clear, for the reason that the defendant was not bound by any statement made by the conductor; that if any such statement was made it was in excess of his authority. The case then proceeded, as we understand it, upon the claim of negligence of the defendant as to the movement of the Grand

River avenue car; and at the close of the entire testimony, upon the motion of defendant, the court directed a verdict and judgment for the defendant, upon the ground that the plaintiff was guilty of contributory negligence.

The case has been removed to this court by writ of error. There are 20 assignments of error in the record, the first of which is that the court erred in directing a verdict and judgment for the defendant. The principal question in the case is whether the circuit judge erred in directing a verdict and judgment for the defendant.

There is no question that the plaintiff was rightfully accepted as a passenger on the Trumbull avenue line of defendant's road. The question whether the defendant was obliged to accept as a passenger a blind man, unaccompanied by an attendant, is not presented. There is authority to the effect that it is not proper to exclude a blind person, simply on account of blindness, if he is competent to care for himself. 6 Cyc. p. 536, and note; *Zachery* v. *Railroad Co.*, 74 Miss. 520 (21 South. 246, 36 L. R. A. 546, 60 Am. St. Rep. 529); *Zachery* v. *Railroad Co.*, 75 Miss. 746 (23 South. 434, 41 L. R. A. 385, 65 Am. St. Rep. 617). The court there said:

" Each case must depend on its own facts, and the reasonableness of the refusal to sell the blind person a ticket must, on principle, depend, not on a universal, arbitrary, and undiscriminating rule like this one, but on the capacity to travel, unaccompanied, of the particular blind person, as shown by the proof on that point in his case."

See note to *Illinois Central R. Co.* v. *Allen*, 121 Ky. 138 (89 S. W. 150, 28 Ky. Law Rep. 108, 11 Am. & Eng. Ann. Cas. 970). The undisputed evidence in the instant case shows that the plaintiff was accustomed to traveling on the street cars of the city unaccompanied; that he was familiar with the street car lines of the city, and was competent to care for himself.

We also are of the opinion that the weight of authority in this country is to the effect that the relation of passen-

ger and carrier continues while the passenger is transfer-
ring from one car to another, he having been furnished a
ticket enabling him to do so, when a transfer from one
street car to another is part of a continuous trip.   6 Cyc.
pp. 541, 542; *Baldwin* v. *Railroad Co.*, 68 Conn. 567
(37 Atl. 418); *Walger* v. *Railway Co.*, 71 N. J. Law,
356 (59 Atl. 14); *Citizens' Street Railroad Co.* v. *Merl*,
134 Ind. 609 (33 N. E. 1014).   See note to *Glenn* v. *Rail-
road Co.*, 165 Ind. 659 (75 N. E. 282, 2 L. R. A. [N. S.]
872, 112 Am. St. Rep. 255, 6 Am. & Eng. Ann. Cas.
1033); *Keator* v. *Traction Co.*, 191 Pa. 102 (43 Atl. 86,
44 L. R. A. 546, 71 Am. St. Rep. 758); *Baltimore, etc.,
R. Co.* v. *State, Use of Hauer*, 60 Md. 449; *Chicago,
etc., R. Co.* v. *Winters*, 175 Ill. 293 (51 N. E. 901);
*Conroy* v. *Railway Co.*, 96 Wis. 243 (70 N. W. 486, 38
L. R. A. 419).

In *Spangler* v. *Traction Co.*, 152 Mich. 405 (116 N.
W. 373), the plaintiff, in the evening, had alighted from
a car at the intersection of Warren avenue and Hoyt
street, in the city of Saginaw, intending to proceed to the
east across Warren avenue to her home on the south side
of Hoyt street.   During that day, in preparing to repave
the street between the rails, and for a short distance
outside the rails, defendant's contractor had removed the
cedar blocks of the old pavement from the south line of
the asphalt roadway on Hoyt street southward for several
hundred feet.   The excavation or opening thus made was
at least seven, and perhaps in places outside the rails a
greater number of inches in depth.   The car on which the
plaintiff rode, having proceeded, she stepped into the exca-
vation, of which she had no knowledge, fell down, and
broke her leg.   She recovered a verdict and judgment,
which were affirmed in this court; the theory of the case
set out in the declaration being that the defendant owed a
duty to her as passenger to stop its cars where she could
alight in safety, and safely cross the street, and, if it
stopped them where the excavation existed, to light the
place, so that the danger could be seen and avoided, or to

warn her of the dangerous condition. It averred that defendant stopped the car at a point where, when she alighted, she was opposite and near the excavation; that no light was set at or near the place; no signal of danger given; and that she was not given any warning of the dangerous character of the street.

Justice OSTRANDER in that case said:

"As the contention of the plaintiff in error is understood, it is that the duty of the railway company, the passenger having alighted safely, was a duty to be measured without reference to the relation of carrier and passenger; that it owed to plaintiff, when she was injured, no other or different duty than if she had been a pedestrian who was attempting to cross the street at the same place. The rule that the relation of carrier and passenger does not cease at the moment the passenger alights from the carrier's vehicle, at the point of destination, but continues until the passenger has had reasonable time to leave the carrier's premises, is qualified in its application to passengers using surface street railroad vehicles. A street is not a passenger station, for the safety of which a street railway company is responsible. Ordinarily, a passenger, having safely alighted from a street car, becomes at once a traveler upon the highway, and his duty and the duty of others towards him have no relation to the reciprocal duties which a moment before existed between the carrier and himself [citing cases]. But, as a general rule, it is the duty of the street railroad carrier to at least exercise proper care to see that the place of alighting is safe, not to stop a car for alighting passengers at a place known to be unsafe (citing many cases); and it would be a narrow application of the rule to hold that the carrier's duty was in all cases performed, if a passenger reached and stood upon the surface of the street in safety. If a passenger alighted in the night, in a dark place, at a point where a step made in any direction would be into an excavation made by the carrier in a street, the surface of which had been theretofore smooth and comparatively level, the existence of the excavation being unknown to the passenger, it would be doing violence to terms to say that the car was stopped and the passenger invited to alight at a proper place, or that the passenger had safely alighted."

There the court was dealing with a case where the pas-

senger had terminated her journey upon the street car, and had alighted to go to her home. We are here dealing with a case where the passenger was transferring from one car to another, for the purpose of continuing his journey.

In *Keator* v. *Traction Co.*, *supra*, the plaintiff, with a transfer ticket, was approaching a street car, intending to get on to it to finish her journey, when she was struck by a piece of the trolley pole, which broke while the motorman was trying to change it to the other end of the car, and it was held that the plaintiff was a passenger. The court said:

"It must be conceded, we think, that the transfer ticket, on its face, was an undertaking to carry her from the point where the car started, in front of the Wyoming House, to her destination on the south side line. She was not a passenger while on the sidewalk, going from one point to the other. Thus far, the construction of the carrier's contract, from the undisputed circumstances and the ticket, is palpable. When did the obligation of the contract end with regard to her at this interval? It must be borne in mind, as so clearly pointed out by the learned judge of the court below, that the injury to her was from a defect in an indispensable attachment of the very vehicle in which defendant had undertaken to carry her. It was not a side-tracked car, or an unused one, which she had no right to get on, but, in the common phrase, it was 'her car,' that had been provided by defendant to carry her to her destination, which caused the injury."

Another case was where the passenger fell into a post hole on the premises of the defendant, while transferring from one car to another. We do not understand that any of the cases hold that the railway company would be liable for the bad condition of a public street used in making the transfer, so long as it had furnished a reasonably safe place to alight from one car, and board the other. In other words:

"A street is not a passenger station, for the safety of which a street railway company is responsible."

Whether or not the conductor of the Trumbull avenue car was within the scope of his employment when he stated to the plaintiff that the way was clear across to the Grand River avenue track, it is not necessary for us to decide; for we think that it clearly appears from the evidence that the way was clear, and the statement was an accurate one of the condition which then existed. There is no testimony that the roadway was in any way obstructed at the time. The place was a thoroughfare, much frequented, where vehicles and cars were passing both ways constantly, as was well known to the plaintiff, as appears by his testimony. So whether the statement was binding upon the defendant or not becomes of no importance in the case, as there was here no breach of duty in any view which we can take of the case.

We are so strongly impressed with the position of the defendant that the plaintiff was guilty of contributory negligence, as matter of law, that we shall not discuss the question of the negligence of the defendant in the management of the Grand River avenue car. The plaintiff is very emphatic in his testimony that he fully understood the conditions as they existed at this crossing. He knew his own infirmity and limitations, and it seems very clear to us that he did not exercise that degree of care and caution required of him, under the circumstances. He left a place of safety and went heedlessly into a place of great danger. In the light of the plaintiff's own testimony, from which we have copied at large, his negligence need not be further discussed. His own testimony is so convincing that further discussion of the subject is not necessary.

The other assignments of error have been examined, and we are of opinion that the circuit judge committed no error therein, and the judgment below is affirmed.

OSTRANDER, C. J., and BIRD, BROOKE, and BLAIR, JJ., concurred.